NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN A. MILLAN, | ) | |
| | ) | Supreme Court No. S-15754 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-09-05491 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| CORNELIA DAHLMANN, | ) | AND JUDGMENT* |
| f/k/a Cornelia Millan, | ) | |
| | ) | No. 1576 – March 23, 2016 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: John Millan, pro se, Newland, North Carolina, Appellant. No appearance by Appellee Cornelia Dahlmann.

Before: Stowers, Chief Justice, Fabe, Winfree, and Bolger, Justices. [Maassen, Justice, not participating.]

## I. INTRODUCTION

John and Cornelia Millan divorced in 2009 after seven years of marriage. This appeal arises from post-divorce enforcement issues. John appeals from superior court orders determining that he owes his former wife the remainder of the equalization payment established by the divorce decree and denying his request that the presiding judge recuse himself from the enforcement proceedings. We affirm the superior court's

---

\*      Entered under Alaska Appellate Rule 214.

denial of John's request for recusal and its decision to reaffirm John's outstanding financial obligations to Cornelia.

## II. FACTS AND PROCEEDINGS

### A. The Divorce And Settlement

John Millan and Cornelia Dahlmann, who goes by "Connie," married in 2002 and separated in 2008 or 2009.[1] Connie filed for divorce in 2009. The superior court required John to pay Connie $1,500 per month in interim spousal support but later reduced the payment to $500 after Connie obtained employment. The superior court also denied John's request for a change of venue from Anchorage to Fairbanks. The parties reached a property division settlement later that year. The agreement awarded a higher value of the marital estate to Connie, and the parties agreed that John owed Connie an equalization payment of $85,000. The parties owned two houses: one in Galena and one in Newland, North Carolina. They agreed that John would place both houses on the market and that he would pay Connie at least $45,000 of the proceeds from the sale of the house in North Carolina, to be credited toward the $85,000 he owed her. The remainder of the equalization payment was to come from two sources. First, a Dodge truck was awarded to Connie, and John agreed to make payments on the truck until it was paid off. Second, once he had paid off the truck, John agreed to pay $700 per month to Connie until she received the full $85,000. The superior court issued a divorce decree in December 2009 in accordance with the terms of the settlement.

---

[1] In the trial court the parties disagreed on the date of separation: John maintained that they separated in October 2008, while Connie asserted that the separation occurred in February 2009. The date of separation is not at issue on appeal.

## B.    Post-Divorce Enforcement Issues

In 2011 Connie filed a motion for a clerk's deed to transfer John's interest in the Galena house to Connie and an order to compel John to take various actions relating to enforcement of the divorce decree.[2] She also requested attorney's fees. In an affidavit, Connie claimed that John had not signed the truck over to Connie and failed to make payments on the truck and to place both houses on the market. At a February 2012 status hearing presided over by Superior Court Judge William F. Morse, John claimed that he had listed the North Carolina house and that the tenants residing in the Galena house intended to purchase that property. He also accepted full responsibility for the debt on the truck. After the hearing, John filed a notice of compliance with the court stating that he had "endeavored to list the [North Carolina] home in June 2011" but that Connie had refused to sign the listing documents; the house had therefore not been listed. Connie countered that her attorney had attempted after June 2011 to contact John's attorney to discuss the sale of the properties and other matters, but her requests were ignored. In February 2012 the superior court granted in part Connie's request for attorney's fees. The superior court also noted that if it did not "soon see evidence of progress in the sale of at least one of the properties," it would consider authorizing Connie to sell them on her own. At this point in the litigation, Connie stopped participating in the proceedings.

---

[2]    Connie requested that the court (1) compel John to execute title on the Dodge truck and deliver the documents that Connie would need to register the truck in Florida, (2) compel John to list the North Carolina house for sale, (3) order a Clerk's Deed to transfer all of John's interest in the Galena house to Connie, (4) require John to pay her half of the rental income he had received on the Galena house and continue to do so going forward, (5) require John to pay $1,500 in attorney's fees, and (6) require John to bring the Dodge truck payments current or to begin paying Connie $700 per month as agreed upon in the decree.

In March 2012 John filed another notice of compliance, attaching the lease-purchase contract on the Galena house. More than a year later, John filed a "Request for Relief and Order for Contempt" alleging, among other things, that Connie had refused to sign documents required to list the North Carolina house as well as insurance checks received for damage to the Galena house. John requested that the superior court hold Connie in contempt and reduce the amount of money he owed her. The superior court acknowledged receipt of John's filings but noted that it was unclear whether Connie had been served properly. The superior court sent John's filings to Connie and gave her until September 30 to respond. In response to another request for relief filed on September 18, the court reiterated its concern that Connie had not received the filings and stated that it was "unwilling to act on [John's] requests until it [was] certain that [Connie had] received notice of them." The court re-sent the filings to Connie at three addresses in Florida, requiring her to respond to John's allegations and requests and to provide her contact information. Documents sent by the court to Connie were returned as undeliverable.

In December 2013 the superior court held a status hearing. Connie failed to appear telephonically as ordered. The superior court issued an order stating that it "intend[ed] to enforce the parties' property agreement as much as is possible." Because John alleged that Connie would not sign the listing documents, the superior court authorized John to sign the documents solely or, if required, on Connie's behalf. The superior court ordered the proceeds from any sale to be placed in an escrow account until the court could determine how to distribute them. As for the Galena house, the superior court required John to place insurance payments for damage to the house into an escrow account. It also authorized John to sign an insurance check for $47,346 on Connie's behalf so he could deposit it; he was then to put that check into escrow as well and to withdraw from that account only to pay the debt owed on the Galena house.

The superior court also required John to take necessary steps to place the Galena and North Carolina houses on the market and deposit all proceeds from the sales into the escrow account.  The superior court stated that once either house was sold, the court would hold another hearing to determine how to distribute proceeds.  The superior court also indicated that in the future it would visit the issue of credits sought by John for payments he had already made toward his debt to Connie[3] as well as a possible adjustment to the distribution of any proceeds as a result of the delayed sales of the houses.

In April 2014 the superior court authorized John to refinance the North Carolina house, noting that once the refinancing was accomplished, John must place the house for sale.  The court also reduced the balance John owed to Connie to $69,500.  Because there had been unanticipated property damage to the Galena house that reduced its value, the court recognized that John should not "unilaterally bear the risk of such a catastrophe."  And in June 2014 the court credited $13,249.55 in truck payments John had made and accordingly reduced the total owed to $56,360.45.[4]

In September 2014 John filed a motion requesting that Judge Morse either sanction Connie by holding her in contempt and reducing John's financial obligation by $25,000 or recuse himself from the case.  John claimed that among other things, Judge Morse had "never even once sanctioned, admonished, scolded[,] or warned [Connie] to obey the decree and orders of the court" and that his failure to do so "creat[ed] an overt

---

[3]    These included $1,100 he spent on storage and attempted delivery of some of her personal belongings and $480 on repairs to the North Carolina house that Connie had agreed to pay for.

[4]    The superior court's June order calculates John's obligation as $56,360.45 by subtracting $13,249.55 from $69,500.  The court appears to have miscalculated, as the amount should have come to $56,250.45.

and blatant appearance of bias." John also challenged the underlying divorce decree. He claimed that it "contained explicit, illegally-worded language that was a clear and blatant act of criminal extortion" and that the superior court's willingness to sign the decree indicated bias and "even complicity in an apparent extortion conspiracy" involving the judge, Connie, and Connie's attorney.[5]

Judge Morse denied John's motion, noting that while the court had already reduced John's debt to Connie and allowed him to sign documents on her behalf, it would not reduce his obligation further. Judge Morse also denied John's request for recusal, and Superior Court Judge Erin B. Marston was appointed to review Judge Morse's decision. Judge Marston affirmed Judge Morse's decision on the grounds that none of John's allegations of bias, including Judge Morse's alleged failure to sanction Connie while holding John to higher levels of accountability, had any merit as grounds for recusal. Observing that the "divorce proceedings and aftermath . . . have been very contentious, with allegations of lying and bad acts by both parties," Judge Marston found nothing in the record to indicate any bias against John by Judge Morse.

In a motion for reconsideration, John argued that Judge Morse also should have taken into account the changed circumstances of his being "totally and permanently disabled by back injuries while attempting to save the lives of two subordinate police officers" while he was the Chief of Police in Hoonah. He claimed that the injuries he sustained in that incident "drastically reduced" his earnings and that these changed circumstances warranted a reduction in the remaining amount owed. Judge Marston denied John's motion for reconsideration of his request for Judge Morse's recusal on the grounds that he "has not demonstrated that some genuine 'material fact or proposition

---

[5]     The settlement conference that led to the property settlement was conducted by a different superior court judge, who also signed the divorce decree.

of law' has been overlooked or misconceived by the court." John then filed another motion for reconsideration restating all of his former claims, which Judge Marston denied.

In October 2014 John submitted documentation showing that the house in Galena had been sold and that the real estate listing on the North Carolina house had expired and could not be reinstated without Connie's signature. He repeated his request that his obligation to Connie be reduced due to her behavior and his changed circumstances, and he again requested that the court hold Connie in contempt.

The superior court issued an order in November 2014 responding to John's most recent round of motions. The order required John to submit settlement documents for the Galena house to demonstrate how much money, if any, was left over after the sale. The superior court also noted that while John was "focused on the wrongs he believes [Connie] to have committed," those accusations "have little to do with the finalization of this distribution of marital property." The superior court stated that "subsequent wrongs do not eliminate the agreement," and it noted that it had nevertheless given John credit toward his debt for various reasons, "including [Connie's] conduct or failure to act."

In light of Connie's absence from the proceedings, the superior court determined that John was no longer required to list the North Carolina property until she "surface[d]," and stated that while John still owed Connie $56,360.45, she would have to make herself known to the court to receive that money. Finally, the court denied John's allegations of bias.

Representing himself, John appeals the superior court's orders determining that he still owes Connie the remaining $56,340.65 from the equalization payment. John argues that the superior court erred by failing to reduce his obligation based on changed circumstances and Connie's alleged misconduct. John also requests that Judge Morse

be disqualified from presiding over the case in the future due to alleged bias. Connie remains absent from these proceedings and did not participate in this appeal.

## III. STANDARDS OF REVIEW

We review "the superior court's enforcement of a property settlement agreement incorporated in a dissolution decree" for abuse of discretion,[6] which exists only "when the decision on review is manifestly unreasonable."[7]

We review a denial of a motion for recusal of a judge for abuse of discretion.[8] The abuse of discretion standard applies to the question "whether the judge is *actually* capable of being fair."[9] The distinct question whether there is a "reasonable appearance of bias" is reviewed de novo.[10]

"[A] trial court's imposition or non-imposition of sanctions [is] subject to review only for abuse of discretion."[11]

---

[6] *McCarter v. McCarter*, 303 P.3d 509, 512-13 (Alaska 2013) (citing *Morris v. Horn*, 219 P.3d 198, 203 (Alaska 2009)).

[7] *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015) (citing *Tufco, Inc. v. Pac. Envtl. Corp.*, 113 P.3d 668, 671 (Alaska 2005)).

[8] *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013) (citing *Wasserman v. Bartholomew,* 38 P.3d 1162, 1170 (Alaska 2002)).

[9] *Phillips v. State*, 271 P.3d 457, 459 (Alaska App. 2012) (emphasis in original).

[10] *Id.*

[11] *Enders v. Parker*, 125 P.3d 1027, 1037 (Alaska 2005) (second alteration in original) (quoting *Alaska Fed. Sav. & Loan Ass'n of Juneau v. Bernhardt*, 794 P.2d 579, 583 (Alaska 1990)).

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Declining To Reduce John's Remaining Equalization Payment Obligation To Connie.

John requests that we "set aside" the 2009 divorce decree, "render . . . void" the November 2014 order reiterating his obligation to pay Connie $56,360.45, and deed the North Carolina house solely to him. John appears to challenge the underlying legal obligations that were settled by the 2009 divorce decree,[12] the trial court's refusal to sanction Connie by reducing John's financial obligation to her, and its failure to consider his changed financial circumstances. We affirm the superior court's decision on this point for three reasons.

First, challenges to the underlying divorce decree are not properly before this court. If John wished to appeal the settlement and decree, he could have done so within the 30-day window provided by Alaska Rule of Appellate Procedure 204(a)(1), but he did not.[13] Therefore, we do not consider John's arguments that the settlement agreement was reached by extortion or that he submitted to the terms under duress.

---

[12] The amount currently owed was calculated by crediting certain payments John has already made against the original amount owed, and the remainder represents the amount he agreed to pay when he agreed to the settlement. The $45,000 from the prospective sale of the North Carolina home was to be paid to Connie and credited against John's obligation, so deeding the house to John without adjusting the amount of debt accordingly would effectively modify that provision of the decree.

[13] "The notice of appeal shall be filed within 30 days from the date shown in the clerk's certificate of distribution on the judgment appealed from, unless a shorter time for filing a notice of appeal applies as provided by Rules 216-220, or unless a different time applies as provided in AS 23.30.128(g)." Alaska R. App. P. 204(a)(1). "A divorce decree is a final and appealable order. A notice of appeal must be filed within thirty days of the judgment that is being appealed." *Jackson v. Sey*, 315 P.3d 674, 678 (Alaska 2013) (internal citations omitted).

Second, the trial court did not abuse its discretion in refusing to sanction Connie by reducing John's financial obligation to her. In order to have imposed contempt sanctions under AS 09.50.010, the trial court would have been required to find that Connie's disobedience of the court's orders was willful.[14] In fact, the superior court was concerned that Connie had never received some relevant filings and that some documents sent to her by the court had been returned as undeliverable. And even if the superior court could have determined that Connie's conduct was willful, eliminating John's $56,360.45 financial obligation would not have been a sanction authorized by statute. Alaska Statute 09.50.020(a) provides that "[a] person who commits a civil contempt is subject to damages, a civil penalty of $5,000 or less for each violation, and other orders as the court finds appropriate." In light of Connie's absence, Judge Morse took reasonable measures to ease the burden on John and permitted him to take the North Carolina house off the market. The trial court's approach was appropriately tailored to the circumstances, and the court did not err by declining to hold Connie in contempt or impose John's requested sanctions.

Finally, John argues that his obligation to Connie should be reduced because his financial circumstances have changed. He claims that he "incur[red] . . . a total, permanent disability" while acting as Hoonah Police Chief in August 2014, when he was involved in an incident in which two of his officers were killed. There is no statutory basis for modification of a property division. While AS 25.24.170(a)-(b) authorizes courts to modify alimony and child support, the statute does not provide for modification of property divisions. We have repeatedly held that "[t]he provisions of a decree adjudicating property rights, unlike provisions for child support, child custody or

---

[14] *Anchorage Police & Fire Ret. Sys. v. Gallion*, 65 P.3d 876, 880 n.18 (Alaska 2003) (citing *L.A.M. v. State*, 547 P.2d 827, 831 (Alaska 1976)).

alimony, constitute a final judgment not subject to modification."[15]  Although a party seeking relief from a final judgment must ordinarily file a motion under Alaska Rule of Civil Procedure 60(b), we cannot fault the superior court for failure to advise John of the correct procedural path[16] because such a motion would have been futile.

Relief is not warranted even under the catch-all provision of Civil Rule 60(b)(6).  While this provision "should be liberally construed to enable courts to vacate judgments whenever such action is necessary to accomplish justice,"[17] it is not intended to relieve parties from "free, calculated, and deliberate choices" made in the past.[18]  Relief is granted only "if no other Rule 60(b) clause applies"[19] and "extraordinary circumstances" exist.[20]  In the context of property divisions, we have identified four factors that constitute such extraordinary circumstances: "(1) the fundamental, underlying assumption of the parties' dissolution agreement has been destroyed; (2) the

---

[15]     *McCarter v. McCarter*, 303 P.3d 509, 513 (Alaska 2013) (quoting *Keffer v. Keffer*, 852 P.2d 394, 396 (Alaska 1993)); *see also Arndt v. Arndt*, 777 P.2d 668, 670 (Alaska 1989) (distinguishing property divisions, which are final judgments that can only be modified "under limited circumstances," from child support awards, which can be modified under "much more liberal standards").

[16]     *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987) (holding that trial courts should inform pro se litigants "of the proper procedure for the action he or she is obviously attempting to accomplish").

[17]     *Sandberg v. Sandberg*, 322 P.3d 879, 888 (Alaska 2014) (quoting *O'Link v. O'Link*, 632 P.3d 225, 230 (Alaska 1981)).

[18]     *Guerrero v. Guerrero*, 362 P.3d 432, 444 (Alaska 2015) (quoting *Sandberg*, 322 P.3d at 888).

[19]     *Cook v. Cook*, 249 P.3d 1070, 1084 (Alaska 2011) (quoting *Juelfs v. Gough*, 41 P.3d 593, 597 (Alaska 2002)).

[20]     *Sandberg*, 322 P.3d at 889.

parties' property division was poorly thought out; (3) the property division was reached without the benefit of counsel; and (4) the asset in controversy was the parties' principal asset."[21]

Here, there is no evidence that the property division was poorly thought out, and both parties were represented by counsel at the time of the divorce settlement and judgment. Nor is there evidence that a "fundamental, underlying assumption" of the divorce decree has been destroyed. Relief under Civil Rule 60(b)(6) due to the destruction of such an assumption is available only under limited circumstances. For instance, we determined that a property division relying in large part on the parties sharing the former husband's military retirement pay should be revisited when it was determined that, under federal law, the retirement pay did not constitute divisible marital property.[22] But here, no assumption has been similarly destroyed. While John has had apparent difficulty selling the houses in Alaska and North Carolina, it is still feasible for the houses to be sold and the money paid to Connie as agreed.

While the incident in Hoonah may now be affecting John's financial circumstances and earning ability, this type of change in financial circumstances after a divorce is not an unusual occurrence and falls far short of the "extraordinary circumstances" required for relief under Civil Rule 60(b).[23] The goal of any division of marital property is to "fairly allocate the economic effect of divorce."[24] Allowing parties to revisit that division after the divorce in light of any change in financial circumstances

---

[21]    *Id.* at 888-89 (quoting *Foster v. Foster*, 684 P.2d 869, 872 (Alaska 1984). While these factors are not exhaustive, we use them as a framework for the analysis.

[22]    *Guerrero*, 362 P.3d at 445.

[23]    *See Cook*, 249 P.3d at 1084.

[24]    AS 25.24.160(a)(4).

would fundamentally undermine that goal, needlessly prolong divorce litigation, and cast a shadow of uncertainty over all property divisions.

Moreover, Civil Rule 60(b) cannot be used as a mechanism to circumvent the prohibition on modifying property divisions that is rooted in Alaska statutory and case law.[25] In *Burrell v. Burrell*, a husband contended that changes in his and his former wife's respective financial circumstances placed him in an inferior financial position.[26] He argued that the change in the parties' financial circumstances rendered the property division inequitable, and he requested modification under Civil Rule 60(b).[27] We affirmed the superior court's denial of his motion, noting that "Civil Rule 60(b)(5) was not intended as a mechanism for maintaining divorced parties' equal net worth."[28]

Because John could not have prevailed on the merits of a Civil Rule 60(b) motion even if the superior court had advised him of the procedure for making such an argument, the superior court's enforcement of the decree is not an abuse of discretion.

**B.     Superior Court Judge Morse Was Not Required To Recuse Himself.**

John claims that Judge Morse was biased and should have disqualified himself. The bases for disqualifying a judge are set out in AS 22.20.020(a).[29] None of

---

[25]     AS 25.24.170(a)-(b); *McCarter v. McCarter*, 303 P.3d 509, 513 (Alaska 2013).

[26]     696 P.2d 157, 166 (Alaska 1984).

[27]     *Id.*

[28]     *Id.* at 167.

[29]     AS 22.20.020(a) provides:

A judicial officer may not act in a matter in which

(1)     the judicial officer is a party;

(continued...)

John's claims fall within the reasons for disqualification listed in the statute. Rather, much of John's argument relies on instances in which Judge Morse ruled against him, including the judge's denial of John's request to change venue, the decision to grant interim spousal support to Connie, and the judge's failure to sanction Connie. We have repeatedly recognized that "[d]isqualification was never intended to enable a

---

[29](...continued)

(2)    the judicial officer is related to a party or a party's attorney by consanguinity or affinity within the third degree;

(3)    the judicial officer is a material witness;

(4)    the judicial officer or the spouse of the judicial officer, individually or as a fiduciary, or a child of the judicial officer has a direct financial interest in the matter;

(5)    a party, except the state or a municipality of the state, has retained or been professionally counseled by the judicial officer as its attorney within two years preceding the assignment of the judicial officer to the matter;

(6)    the judicial officer has represented a person as attorney for the person against a party, except the state or a municipality of the state, in a matter within two years preceding the assignment of the judicial officer to the matter;

(7)    an attorney for a party has represented the judicial officer or a person against the judicial officer, either in the judicial officer's public or private capacity, in a matter within two years preceding the filing of the action;

(8)    the law firm with which the judicial officer was associated in the practice of law within the two years preceding the filing of the action has been retained or has professionally counseled either party with respect to the matter;

(9)    the judicial officer feels that, for any reason, a fair and impartial decision cannot be given.

discontented litigant to oust a judge because of adverse rulings made,"[30] and "[m]ere evidence that a judge has exercised his [or her] judicial discretion in a particular way is not sufficient to require disqualification."[31] Similarly, John's claim that Judge Morse decided in Connie's favor "100% of the time[]" is not only inaccurate, it also fails as a basis for demonstrating bias. "[J]udicial bias should not be inferred merely from adverse rulings."[32] Rather, "[t]o prove a claim of judicial bias, the claimant must show that the judge formed an opinion of [the claimant] from extrajudicial sources, resulting in an opinion other than on the merits."[33] John has provided no such evidence in this case. In fact, throughout the proceedings Judge Morse has taken many reasonable measures to deal equitably with the many post-divorce enforcement issues raised by both parties, including permitting John to sign required listing documents and an insurance check without Connie, authorizing him to refinance the North Carolina house, and permitting John to take that house off the market in light of Connie's extended absence from the proceedings.

John also argues that Judge Morse demonstrated bias in Connie's favor by giving her "prompt[s]" and "cue[s,]" by "illegally extending a hearing for her to call in," and by remarking that "[Connie] has an interest [in the proceedings] and it was

---

[30] *Luker v. Sykes*, 357 P.3d 1191, 1199 (Alaska 2015) (alteration in original) (quoting *Sagers v. Sackinger*, 318 P.3d 860, 867 (Alaska 2014)).

[31] *Id.* (first alteration in original) (quoting *Sagers*, 318 P.3d at 867).

[32] *Kinnan v. Sitka Counseling*, 349 P.3d 153, 160 (Alaska 2015) (quoting *Khalsa v. Chose*, 261 P.3d 367, 376 (Alaska 2011)); *see also Crawford v. State*, 337 P.3d 4, 33 (Alaska 2011) (holding that "a judge's adverse rulings are not a ground for disqualification unless the party moving for disqualification shows that the judge's rulings were the result of personal bias developed from a non-judicial source").

[33] *Luker*, 357 P.3d at 1199 (quoting *Ronny M. v. Nanette H.*, 303 P.3d 392, 409 (Alaska 2013)).

anticipated she would in fact participate." As Judge Marston noted in his decision upholding Judge Morse's decision not to recuse himself, it is unclear what hearing John is referring to. But as Judge Marston observed, even if Judge Morse *had* made such a statement, "[a]cknowledging that a party will likely be telephonic is not an indication of bias." Throughout the proceedings, Judge Morse was careful to ensure that Connie was served properly and able to participate in the proceedings. But those efforts do not indicate any bias against John.

John also claims that Judge Morse's actions created an "appearance of impropriety." This claim appears merely to reflect John's dissatisfaction with the outcome of the proceedings. An appearance of impropriety is found when "the conduct would create in reasonable minds a *perception* that the judge's ability to carry out judicial responsibilities with integrity, impartiality[,] and competence is impaired."[34] After a review of the record, we can discern no appearance of bias against John.

Finally, John argues that Judge Marston's review of Judge Morse's decision not to recuse himself was "cursory, biased, incomplete[,] and flawed" and that Judge Marston "shield[ed]" Judge Morse from accountability. Judge Marston's thorough five-page opinion is well-reasoned and does not demonstrate any bias or abuse of discretion. There is certainly no evidence in the record of any bias against John on the part of Judge Marston, and John's arguments on this point are without merit.

A judge's determination not to recuse himself or herself will not constitute an abuse of discretion unless it is "plain that a fair-minded person could not rationally come to that conclusion on the basis of the known facts."[35] Because the record reveals

---

[34] *Ogden v. Ogden*, 39 P.3d 513, 516 (Alaska 2001) (emphasis in original) (quoting Alaska Code of Judicial Conduct Canon 2(A) commentary).

[35] *Rodvik v. Rodvik*, 151 P.3d 338, 352 (Alaska 2006) (quoting *Amidon v.* (continued...)

- 16 -                                                                 *1576*

neither actual bias nor the appearance of bias, we affirm the superior court's denial of John's motions for recusal.

## V.     CONCLUSION

We AFFIRM the superior court's November 2014 order confirming John's financial obligation to Connie. We also AFFIRM the superior court's denial of John's request for Judge Morse's disqualification.

---

**35**(...continued)
*State*, 604 P.2d 575, 577 (Alaska 1979)).